1

2

3

4

5

6

7

8          IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10   PATRICK WILLIAM BANKS,

11              Petitioner,                    No. CIV S-05-797 MCE CHS P

12        vs.

13   MARK SHEPHERD, et al.,

14              Respondents.        FINDINGS AND RECOMMENDATIONS

15   _____/

16                      I.  INTRODUCTION

17              Petitioner Patrick William Banks is a state prisoner proceeding pro se with a

18   petition for writ of habeas corpus pursuant to 28 U.S.C. §2254.  Petitioner is currently serving an

19   indeterminate sentence of sixteen years to life following a 1989 offense and subsequent

20   conviction in San Joaquin County for second degree murder with use of a deadly weapon.  Here,

21   petitioner does not challenge the constitutionality of that conviction, but rather, the execution of

22   his sentence, and specifically, the July 25, 2003 decision of Governor Davis and the November

23   15, 2004 decision of Governor Schwarzenegger, each reversing a separate and distinct decision

24   of the Board of Prison Terms that petitioner was suitable for parole.  Based on a thorough review

25   of the record and applicable law, it is recommended that the petition be denied.

26   /////

1

II.  BACKGROUND

The facts of petitioner's life crime were summarized at his February 26, 2003 parole suitability hearing:

> [O]n February 19, 1989 at approximately 5:50 p.m., a California Highway Patrol responded to a traffic collision on a highway in San Joaquin County in which the victim, Lisa Rees..., died.  Banks and the victim, his live-in girlfriend, had an argument which was followed by Banks following the victim with his vehicle at a high rate of speed.  He was tailgating her vehicle, driving recklessly and speeding at approximately... 80 to 90 miles per hour in a 50 mile per hour zone.  At one point, he ran through a red light at a high rate of speed.  Banks' vehicle then either bumped the victim's vehicle from behind or they both couldn't handle a tight curve at the high rate of speed which they were driving.  Both vehicles went off the embankment approximately 25 feet high causing the death of the victim from receiving head and neck injuries.

(Transcript of the February 26, 2003 Subsequent Parole Hearing ("2003 Transcript") at 10.)

Petitioner was convicted of second degree murder with use of a deadly weapon and sentenced to a term of sixteen years to life in state prison.  His minimum eligible parole date passed on March 20, 2000.  On February 26, 2003, a panel of the Board of Prison Terms ("Board") conducted a second subsequent (third overall) hearing to determine petitioner's suitability for parole and concluded that he was suitable for parole because he would not pose an unreasonable risk of danger to society or a threat to public safety if released.  On July 25, 2003, Governor Davis reversed the Board's decision.

Petitioner challenged Governor Davis's reversal in the Sacramento County Superior Court; his petition was transferred to San Joaquin County and denied in a reasoned decision.  The California Court of Appeal, Third District, denied petitioner's claims on appeal without written explanation, and the California Supreme Court denied review.

In the meantime, petitioner came before the Board for another suitability determination on June 28, 2004, at which time he was again found to be suitable for parole and given a parole date in December of 2004.  In a decision dated November 15, 2004, Governor Schwarzenegger exercised his discretion to reverse this second grant of parole.  Petitioner

challenged Governor Schwarzenegger's reversal in an original petition for writ of habeas corpus to the California Supreme Court, which was denied with citation to *In re Rosenkrantz*, 29 Cal.4th 616 (2002).

The pending federal petition was filed on April 22, 2005.  Respondent filed a motion to dismiss based on this court's holding in *Sass v. California Bd. Of Prison Terms*, 376 F. Supp. 2d 975 (E.D. Cal. 2005) that a prisoner such as petitioner had no protected liberty interest in parole.  Respondents's motion to dismiss was granted and the petition dismissed in an order filed on January 4, 2006.  Petitioner appealed the decision to the Ninth Circuit Court of Appeals, and on January 8, 2008, the judgment was vacated and the case remanded to this court with instructions to reconsider the petition in light of the Ninth Circuit's decision in *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123 (9th Cir. 2006), which reaffirmed that California inmates serving sentences with the possibility of parole have a liberty interest in receipt of a parole release date.

### III.  CLAIMS PRESENTED

For his first ground, petitioner contends that both governors' reversals were without support in the record, in violation of his right to due process and the Eighth Amendment's prohibition on cruel and unusual punishment.  For his second ground, petitioner claims a "[v]iolation of federal due process because Governor arbitrarily violated Cal. Pen. Code 3041 & its implementing regulations in considering Petitioner for parole, simultaneously arbitrarily violating the separation of powers doctrine in the Calif. Constitution."  For his third ground, petitioner claims a "[v]iolation of federal due process because Calif. Executive (Governor & Board) retrospectively changed parole policy & standards for release to Ptnr's detriment in application of PC 3041."

For purposes of this opinion, petitioner's claims will be analyzed as follows: (A) whether petitioner has suffered a due process violation; (B) whether petitioner has suffered an Eighth Amendment violation and (C) whether petitioner is entitled to relief for alleged violations of state law.

IV.  EXHAUSTION

Respondent admits that petitioner has exhausted his state court remedies with respect to his claim that no evidence supported Governor Davis's 2003 reversal.  Respondent denies that petitioner exhausted his claim that Governor Davis's 2003 decision violated his Eighth Amendment rights.  Respondent does not contest the exhaustion of petitioner's claims as they relate to Governor Schwarzenegger's 2004 reversal.

V.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (*citing Engle v. Isaac*, 456 U.S. 107, 119 (1982)). This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999).  Under AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

VI.  DISCUSSION

A.    Due Process

The Due Process Clause of the Fourteenth Amendment prohibits state action that deprives a person of life, liberty, or property without due process of law.  A person alleging a due

process violation must first demonstrate that he or she was deprived of a protected liberty or property interest, and then show that the procedures attendant upon the deprivation were not constitutionally sufficient. *Kentucky Dep't. of Corrections v. Thompson*, 490 U.S. 454, 459-60 (1989); *McQuillion v. Duncan*, 306 F.3d 895, 900 (9th Cir. 2002).

A protected liberty interest may arise from either the Due Process Clause itself or from state laws. *Board of Pardons v. Allen*, 482 U.S. 369, 373 (1987). The United States Constitution does not, in and of itself, create a protected liberty interest in the receipt of a parole date. *Jago v. Van Curen*, 454 U.S. 14, 17-21 (1981). However, if a state's statutory parole scheme uses mandatory language, it "creates a presumption that parole release will be granted" when or unless certain designated findings are made, thereby giving rise to a constitutional liberty interest. *McQuillion*, 306 F.3d at 901 (*quoting Greenholtz v. Inmates of Nebraska Penal*, 442 U.S. 1, 12 (1979)).

California Penal Code section 3041 sets forth the legislative standards for determining parole for life-sentenced prisoners such as petitioner. Subsection (a) provides that "[o]ne year prior to the inmate's minimum eligible parole release date a panel... shall meet with the inmate and shall normally set a parole release date." Cal Penal Code §3041(a). Subsection (b) provides an exception to the regular and early setting of a lifer's term, if the Board determines "that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration..." Cal. Penal Code §3041(b). The Ninth Circuit has accordingly determined that California state prisoners who have been sentenced to prison with the possibility of parole have a clearly established, constitutionally protected liberty interest in receipt of a parole release date. *Irons v. Carey*, 505 F.3d 846, 850-51 (9th Cir. 2007) (*citing Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006)); *Biggs v. Terhune*, 334 F.3d 910, 914 (9th Cir. 2003); *McQuillion*, 306 F.3d at 903; and *Allen*, 482 U.S. at 377-78 (*quoting Greenholtz*, 442 U.S. at 12)).

The full panoply of rights afforded a defendant in a criminal proceeding is not constitutionally mandated in the context of a parole proceeding. *See Pedro v. Or. Parole Bd.*, 825 F.2d 1396, 1398-99 (9th Cir. 1987). The Supreme Court has held that a parole board's procedures are constitutionally adequate if the inmate is given an opportunity to be heard and a decision informing him of the reasons he did not qualify for parole. *Greenholtz*, 442 U.S. at 16.

Additionally, as a matter of *state* constitutional law, denial of parole to California inmates must be supported by "some evidence" demonstrating future dangerousness. *Hayward v. Marshall*, No. 06-55392, slip op. at 34-35 (9th Cir. April 22, 2010) (en banc) (citing *In re Rosenkrantz*, 59 P.3d 174, 210 (Cal. 2002), *In re Lawrence*, 190 P.3d 535, 549 (Cal. 2008), and *In re Shaputis*, 190 P.3d 573, 582 (Cal. 2008)). The federal Due Process Clause requires, in turn, that California comply with its own quantum of evidence requirement. *See Hayward v. Marshall*, No. 06-55392, (Berzon, J., concurring in part and dissenting in part at 13). In *Hayward*, the Ninth Circuit Court of Appeals directed reviewing courts in this circuit to "decide whether the California judicial decision approving the governor's decision rejecting parole was an 'unreasonable application' of the California 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.' *Hayward Marshall*, slip op. at 37.

The analysis of whether some evidence supports denial of parole to a California state inmate is framed by the state's statutes and regulations governing parole suitability determinations. *See Irons*, 505 F.3d at 851. This court "must look to California law to determine the findings that are necessary to deem [a petitioner] unsuitable for parole, and then must review the record to determine whether the state court decision holding that these findings were supported by 'some evidence' [ ] constituted an unreasonable application of the 'some evidence' principle." *Id*.

Title 15, Section 2402 of the California Code of Regulations sets forth various factors to be considered by the Board in its parole suitability findings for murderers. The

regulation is designed to guide the Board's assessment of whether the inmate poses "an

unreasonable risk of danger to society if released from prison," and thus whether he or she is

suitable for parole. *In re Lawrence*, 44 Cal.4th 1181, 1214, 1202 (2008). The Board is directed

to consider all relevant, reliable information available regarding

> the circumstances of the prisoner's social history; past and present
> mental state; past criminal history, including involvement in other
> criminal misconduct which is reliably documented; the base and
> other commitment offenses, including behavior before, during and
> after the crime; past and present attitude toward the crime; any
> conditions of treatment or control, including the use of special
> conditions under which the prisoner may safely be released to the
> community; and any other information which bears on the
> prisoner's suitability for release.

15 Cal. Code Regs. §2402(b). The regulation also lists several specific circumstances which tend

to show suitability or unsuitability for parole. 15 Cal. Code Regs. §2402(c)-(d). The overriding

concern is public safety and the focus is on the inmate's *current* dangerousness. *In re Lawrence*,

44 Cal. 4th at 1205. Thus, the proper articulation of the standard of review is not whether some

evidence supports the reasons cited for denying parole, but whether some evidence indicates that

a parolee's release would unreasonably endanger public safety. *In re Shaputis*, 44 Cal.4th 1241,

1254 (2008). In other words, there must be some rational nexus between the facts relied upon

and the ultimate conclusion that the prisoner continues to be a threat to public safety. *In re*

*Lawrence*, 44 Cal. 4th at 1227.

The statutory procedure guiding the governor's review of a parole decision of an

inmate sentenced to an indeterminate term for a murder conviction is contained in title 15,

section 3041.2 of the California Code of Regulations. Although the governor undertakes an

independent, de novo review of an inmate's suitability for parole, his decision must be based on

the same statutory factors and the same evidentiary record that was before the Board. *In re*

*Rosenkrantz*, 29 Cal.4th 616, 661 (2002). The governor is entitled, however, to weigh the

suitability factors differently than did the Board. *See Id*. He may choose to be more stringent or

cautious in determining whether an inmate poses an unreasonable risk to public safety. *In re*

*Shaputis*, 44 Cal.4th at 1258.  Nevertheless the governor's decision must still reflect due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, and must be supported by some evidence in the record.  *In re Lawrence*, 44 Cal.4th 1181, 1204.

        1.        2003 Grant of Parole and Subsequent Reversal by Governor Davis

                a.  The Board's 2003 decision

        The Presiding Commissioner for the 2003 panel of the Board indicated their reliance on several different statutory circumstances in reaching the conclusion that petitioner was suitable for parole.

        First, although petitioner has a juvenile record, they determined he has no juvenile record of assaulting others.  *See* 15 Cal. Code Regs. § 2402(d)(1).  It was additionally noted that petitioner has no adult arrests other than for the commitment offense.  The Board appeared to find that petitioner has a stable social history.  *See* 15 Cal. Code Regs. § 2402(d)(2).  He was an only child raised in a stable home environment by two parents who were both well respected educators in the Stockton community.  It was noted that petitioner maintained close family ties during his incarceration via letters and frequent visits from his parents and his two daughters.

        The Board also found that petitioner had enhanced his ability to function within the law upon release through consistent participation in educational, vocational, and other institutional programming.  *See* 15 Cal. Code Regs. § 2402(d)(9).  Petitioner obtained his GED while incarcerated in 1990 and later obtained his high school diploma in 1993.  He completed a silk screening vocation and accompanying apprenticeship program.  He has consistently participated in AA and NA and served at one time as Chair or Vice Chair for each program.  He completed various self help programs including Personal Health Assessment and Self-Energizing Systems, Anger Management, Cage Your Rage, Victims' Awareness, and a Parenting Group, among others, and at the time of the hearing was involved with Center Prayer Group.  At the time of the hearing petitioner was assigned to the Landscaping crew where he had received above

1    average evaluations.

2            Petitioner maintained positive institutional behavior while incarcerated.  *See* 15

3    Cal. Code Regs. §2402(d)(9).  His exemplary record contained no recent major or minor

4    disciplinary reports.  In fact, his record was clean apart from the documentation of wearing an

5    unauthorized straw hat in 1993 and theft of state food and failure to make count in 1991.

6            The Board determined that petitioner had made realistic plans for parole.  *See* 15

7    Cal. Code Regs. §2402(d)(8).  Letters of support submitted by various family and friends on his

8    behalf demonstrated that he would have an adequate support system upon release, including

9    several offers of assistance finding future employment.  Petitioner demonstrated in addition that

10   he had obtained a job offer as cook at a pizza place.  Petitioner's parents offered him support

11   including a place to live; in the alternative, petitioner owns his own home and could reside there

12   with one of his daughters.

13           The Board found that petitioner had shown signs of remorse.  *See* 15 Cal. Code

14   §2402(d)(3).  It was concluded that he understands the nature and magnitude of his offense,

15   accepts responsibility for his criminal behavior, and displays a desire to change toward good

16   citizenship.  The Board also found that his chances of recidivism were reduced by his

17   demonstrated maturation, growth and greater understanding coupled with his advanced age.  *See*

18   15 Cal. Code Regs. §2402(d)(7).

19           b.  Governor Davis's 2003 reversal

20           In his written decision dated July 25, 2003, Governor Davis noted the various

21   positive factors for petitioner's release:

22           Mr. Banks has made laudable progress while in prison.  He has
             earned both his high school diploma and his GED.  He completed
23           vocational silk screening, graphic arts and printing.  He has
             received numerous laudatory reports for his participation in self-
24           help programs, including Alcoholics Anonymous and Narcotics
             Anonymous.  He has positive work performance reports.  Mr.
25           Banks has expressed remorse and established viable parole plans.

26   (Davis Letter at 2.)

Ultimately, however, Governor Davis reached the opposite conclusion of the Board:

> I believe that [the positive factors for Mr. Banks' release] are outweighed by negative factors demonstrating that he is unsuitable for parole at this time.
>
> Throughout their tumultuous relationship, Mr. Banks carried out a pattern of domestic violence, including stalking, physical abuse and threats of death against Ms. Rees. On the day of the murder, Mr. Banks had lain in wait for Ms. Rees. Just three months before the murder, he waited to confront her at her son's school, dragging her off the school grounds. In that instance, police were called. On the day of the murder, Ms. Rees did not wait to be attacked or for police to arrive. Having previously been threatened by Mr. Banks with death, Ms. Rees got in her car and fled when she saw him.
>
> Mr. Banks high speed pursuit of Ms. Rees was not an isolated incident. Rather, it was the culmination of his pattern of abuse towards women and escalating criminal conduct. Police reports document Mr. Banks's history of violence in relationships, including repeated instances of stalking and high speed car chases involving not only Ms. Rees, but also Mr. Banks's former girlfriend and her boyfriend. His extensive criminal history includes three arrests for battery, three convictions for resisting arrest, two convictions of excessive speeding, three convictions of driving under the influence and three convictions of reckless driving.
>
> In light of Mr. Banks's history of domestic violence, stalking and reckless driving, I believe the Board of Prison Terms gave inadequate consideration to the gravity of Mr. Banks's crime. The facts demonstrate that Mr. Banks carried out his violent obsession with Ms. Rees, killing her in a manner demonstrating no regard for human life. When Mr. Banks surprised and confronted Mr. Rees, she fled in fear. He chased her at high speeds, tailgating her and running a red light. His reckless driving endangered Ms. Rees and countless other innocent drivers and bystanders. A witness testified that Mr. Banks ultimately "rammed" the back of Ms. Rees's car, causing both cars to fly off a 25-foot embankment.
>
> Mr. Banks intentional conduct through the chase evidences extreme indifference to the value of human life. It is particularly serious given his history of stalking, physical abuse, similar chases and convictions for excessive speeding, driving under the influence and reckless driving. This was not an isolated incident out of character for Mr. Banks. Just the opposite. It was the culmination of a pattern of violence. I believe the gravity of the offense alone is such that consideration of the public safety requires a more

lengthy period of incarceration.

The Board of Prison Terms relied on Mr. Banks's acceptance of responsibility. I disagree. Although he claims to have accepted responsibility, he has consistently attempted to minimize his culpability. He continues to maintain that he only intended to speak with Ms. Rees and did not wish to hurt her. This is inconsistent with the facts and Mr. Banks's prior conduct. He showed up where he knew Ms. Rees would be, hid from her view, confronted her, chased her at high speeds, tailgated her and finally rammed into the back of her car. Furthermore, Mr. Banks has consistently attempted to minimize his actions by claiming that drug and alcohol dependency was responsible for his "manic" behavior. However, breathalyzer tests administered immediately after the murder showed no presence of alcohol in his system. At the February 2003 suitability hearing, he again claimed that Ms. Rees's death was an "accident." Rather than accept responsibility for her fear, injuries and death, he blamed her failure to negotiate a turn at high speeds. He also denied "ramming" her with his car. The fact that Mr. Banks still blames Ms. Rees's death on her driving demonstrates his inability to grasp that she was running away out of fear of physical violence at his hands. Mr. Banks's failure to fully acknowledge his responsibility for the murder is a negative factor that I find weighs against parole.

Mr. Banks was previously given probation several times, placed in juvenile hall on six different instances and ordered to substance recovery three times. He failed to benefit from these attempts at rehabilitation. Given his refusal to accept full responsibility for the death of Ms. Rees and his prior failures at rehabilitation, I believe he continues to pose an unreasonable risk to society.

I also do not believe Mr. Banks has a stable social history. He dropped out of high school in the ninth grade and at age 14 began a serious and lengthy pattern of substance abuse. In addition to alcohol abuse, he admits extensive use of methamphetamines, cocaine, heroin, marijuana, LSD, mushrooms, glue sniffing, pills, Valium, barbiturates and speed. While out on bail for Ms. Rees's murder, Mr. Banks admits to daily use of methamphetamines and heroin. As a juvenile, he engaged in an extensive course of criminal conduct. Mr. Banks's past performance within the community demonstrates that he cannot lead a successful life in an unstructured environment, another factor indicating that he is not suitable for parole.

Finally I note the San Joaquin County District Attorney's Office also found that Mr. Banks has failed to fully confront his actions and continues to minimize his history of domestic abuse. The District Attorney noted that Mr. Banks attempts to blame all of his behavior on his drug and alcohol dependency, even though there is no actual evidence that he was intoxicated at the time of the

11

murder.  The deputy at the February 2003 hearing summed it up
very well: Alcohol didn't kill Ms. Rees.  Drugs didn't kill Ms.
Rees.  Mr. Banks killed Ms. Rees.  I agree.

I note the numerous letters of support from Mr. Banks's family and
friends, I have considered these and other positive factors
supporting Mr. Banks's suitability for parole.  However, each of
the negative factors individually outweighs all of the positive
factors.  Mr. Banks has demonstrated a pattern of stalking and
violence against women, including prior high speed chases.  He has
repeatedly evidenced a disregard for the lives of others, particularly
when behind the wheel.  Yet despite the tragic and senseless
murder of Ms. Rees, he still fails to grasp his culpability.  Thus, he
continues to pose an unreasonable risk of danger to society.  I
therefore REVERSE the Board of Prison Terms' decision to parole
Mr. Banks.

(Davis Letter at 2-4.)

In a written decision, the San Joaquin County Superior Court held that Governor

Davis' reversal was supported by some evidence.  The superior court did not specifically identify

or discuss which factors relied upon by the governor constituted some evidence in this case.

c.  Examination of the individual factors relied upon by Governor Davis

Governor Davis disagreed with several of the Board's conclusions regarding

petitioner's suitability for parole.  He appeared to rely specifically upon the following factors in

concluding that petitioner was not suitable to be released on parole: (i) the circumstances of the

commitment offense; (ii) petitioner's previous criminality and conduct prior to incarceration; (iii)

petitioner's lack of understanding, insight or remorse or failure to accept responsibility; and (iv)

petitioner's social history.

i.  The commitment offense

At the outset, Governor Davis indicated that he believed the Board had given

inadequate consideration to the gravity of petitioner's crime.  The gravity of an inmate's

commitment offense can by itself be a sufficient basis for denying parole where the facts are

especially heinous or particularly egregious.  *In re Rosenkrantz*, 29 Cal.4th 616, 682 (2002); s*ee*

*also Biggs v. Terhune*, 334 F.3d 910, 913-16 (9th Cir. 2003); *Sass v. Cal. Bd. of Prison Terms*,

461 F.3d 1123, 1126 (9th Cir. 2006); *Irons v. Carey*, 505 F.3d 846, 852-53 (9th Cir. 2007).

There must, however, be some rational nexus between the facts of the commitment offense relied

upon and the ultimate conclusion that the prisoner continues to be a threat to public safety.  *In re*

*Lawrence*, 44 Cal.4th at 1214, 1227 ("the aggravated nature of the crime does not in and of itself

provide some evidence of *current* dangerousness to the public unless the record also establishes

that something in the prisoner's pre- or post-incarceration history, or [ ] current demeanor and

mental state, indicates that the implications regarding the prisoner's dangerousness that derive

from his or her commission of the commitment offense remain probative to the statutory

determination of a continuing threat to public safety") (emphasis in original).  The relevant

inquiry is an individualized one: "whether the circumstances of the commitment offense, when

considered in light of other facts in the record, are such that they continue to be predictive of

current dangerousness many years after commission of the offense."  *In re Lawrence*, 44 Cal.4th

at 1221.  The passage of time and attendant changes in the inmate's psychological or mental

attitude are relevant considerations.  *Id*.

Under the relevant regulatory scheme, a prisoner's commitment offense tends to

show unsuitability for parole for where it was committed "in an especially heinous, atrocious or

cruel manner."  15 Cal. Code Regs. §2402(c)(1).  Although the governor repeatedly cited the

facts of petitioner's commitment offense to support his reversal of the Board's decision, the

offense does not appear to fit the regulatory factors that show an offense was committed in

especially heinous, atrocious or cruel manner.  According to the relevant regulation, the factors to

be considered include: (A) whether multiple victims were attacked, injured or killed in the same

or separate incidents; (B) whether the offense was carried out in a dispassionate and calculated

manner, such as an execution-style murder; (C) whether the victim was abused, defiled or

mutilated during or after the offense; (D) whether the offense was carried out in a manner which

demonstrates an exceptionally callous disregard for human suffering; and (E) whether the motive

for the crime is inexplicable or very trivial in relation to the offense."  15 Cal. Code Regs.

§2402(c)(1)(A)-(E).

In petitioner's case, although his reckless driving endangered many innocent bystanders, it cannot be said that multiple victims were attacked, injured or killed. The offense, even as described by the governor, was not so dispassionate or calculated that it compares to an execution-style murder, and it involved no abuse or mutilation. The governor emphasized that petitioner's intentional conduct throughout the chase evidenced extreme indifference to the value of human life, which is true, but the same could be said of all murders. The relevant statutory factor inquires whether the offense involved a callous disregard for human *suffering* and there is no such evidence regarding petitioner's offense. *See In re Weider*, 145 Cal.App.4th 570, 587 (6th Dist. 2006) ("all second degree murders will involve some amount of viciousness or callousness.").

Nor is there evidence that petitioner's motive for the offense was especially trivial, within the meaning of the relevant regulation. Just as all murders show indifference to the value of human life, all motives for murder could reasonably be deemed trivial in relation to the offense. *See In re Scott*, 119 Cal.App.4th 871, 893 (1st Dist. 2004) (in order to fit the regulatory description, the prisoner's motive must be more trivial than those which conventionally drive people to commit the offense in question).

"The measure of atrociousness is not general notions of common decency or social norms, for by that yardstick all murders are atrocious." *In re Lee*, 143 Cal.App.4th 1400, 1410 (2nd Dist. 2006). In this case, petitioner's offense was certainly grave and serious, however, its circumstances do not appear to fit the regulatory description for one that is so heinous, atrocious or cruel that it, by itself, demonstrates petitioner's unsuitability for parole. On the record that was before the Board and Governor Davis in 2003, a determination that petitioner was currently dangerous and unsuitable for parole based solely on the facts of his commitment offense was not supported by some evidence in the record. Governor Davis cited additional factors, however, in reversing the Board's decision.

14

ii.  Criminal history

Governor Davis appeared to find the circumstances of petitioner's commitment offense especially probative to a determination of his current dangerousness because the offense was "the culmination of his pattern of abuse towards women and escalating criminal conduct." The governor cited police reports documenting "repeated instances of stalking and high speed car chases" involving both the victim and a previous girlfriend.  He characterized petitioner's criminal history as "extensive," including "three arrests for battery, three convictions for resisting arrest, two convictions of excessive speeding, three convictions of driving under the influence and three convictions of reckless driving."

Under the relevant regulation, the fact that a prisoner has a previous record of violence tends to show him unsuitable for release where "[t]he prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age."  15 Cal. Code Regs. § 2402(c)(2). Conversely, the fact that a prisoner "lacks any significant history of violent crime" tends to show suitability for release on parole.  15 Cal. Code Regs. § 2402(d)(6).

Governor Davis' characterization of petitioner's criminal history was markedly different from that of the 2003 panel of the Board, who indicated that petitioner had "no juvenile record of assaulting others... and no arrests as an adult."  (2003 Transcript at 110.)  The 2003 Board also did not discuss petitioner's previous stalking of another girlfriend or evidence that he had engaged in another high speed chase.  Nevertheless, petitioner does not contest the factual findings of Governor Davis in this regard and they appear to be accurate.

Subsequently, at his June 28, 2004 Board hearing, petitioner admitted that he had previously stalked the victim and been physically abusive on one prior occasion.  He also admitted that he had previously engaged in a vehicle chase of an ex-girlfriend and her boyfriend. Petitioner denied that he had ever assaulted another woman besides the victim.  It was additionally clarified that petitioner has no other adult convictions but has been arrested as an

adult, once for drunk driving and possibly on another occasion for battery.  (2004 Transcript at 19-20, 32.)

Petitioner's pre-commitment criminal history includes at least one previous instance of violence; the record before this court does not indicate whether, on this occasion, he "inflicted or attempted to inflict serious injury" on the victim.  Assuming, in addition, for purposes of this opinion, that Governor Davis's finding that petitioner has incurred three arrests for battery is accurate, it remains unclear whether petitioner has inflicted or attempted to inflict serious injury on previous occasions or whether he demonstrated assaultive behavior at an early age.

Nevertheless, both the Board and the governor are empowered to consider, in addition to the circumstances specified under the relevant suitability factors, "any other information which bears on the prisoner's suitability for release."  15 Cal. Code Regs. §2402(b). Governor Davis placed additional reliance on other information in petitioner's criminal history, including his prior instances of reckless driving and another high speed chase.  Such reliance is authorized to the extent those historical factors remain probative to a determination of petitioner's current dangerousness.  The relevant question is whether petitioner's record of previous criminality and other pre-prison conduct, considered in conjunction with the facts of his commitment offense, constituted some evidence that he still posed an unreasonable risk of danger to the public, if released on parole, at the time of the 2003 suitability determination.

The passage of time can certainly attenuate the taint of prior criminal behavior, and this is particularly true as applied to the consideration of misconduct which occurred prior to a prisoner's commitment offense, and thus prior to all rehabilitative efforts in prison.  The Ninth Circuit Court of Appeals has noted that a prisoner's pre-commitment criminal history, much like the circumstances of the commitment offense itself, is an "unchanging factor" for which continued reliance upon for the denial of parole could result in a due process violation.  *See Biggs*, 334 F.3d 910, 916-917 (9th Cir. 2003); *see also Irons*, 505 F.3d at 853-54 (repeated denial

based on an unchanging factor "will at some point violate due process" where there is evidence of rehabilitation and the prisoner has served the minimum term on his sentence).

This is not a case in which petitioner has been repeatedly denied parole based on continued reliance on unchanging factors in violation of due process.  Given his history of criminality and violence, including the fact that he engaged in prior car chases, stalking, and at least one admitted instance of domestic violence, it cannot be concluded that Governor Davis' determination that petitioner remained currently dangerous because of his commitment offense, criminal history, and other pre-prison conduct was without any support in the record.

### iii.  Lack of insight or remorse

Governor Davis also disagreed with the Board's conclusion that petitioner had accepted responsibility for his past criminal behavior and life crime.  In particular, he took issue with the fact that petitioner had previously characterized the offense as an accident.  The governor also stated that petitioner has engaged in minimization of his actions by claiming that his drug and alcohol dependency was responsible for much of his past behavior, including the commitment offense.  Despite the governor's conclusion, there is no evidentiary support for a finding that petitioner remained currently dangerous at the time of review because of a lack of insight or remorse into his commitment offense.

California law is clear that petitioner cannot be required to admit guilt in order to be found suitable for parole.  Cal. Penal Code §5011(b); 15 Cal Code Regs. §2236.  Although his "past and present attitude toward the crime" and presence or lack of remorse or understanding were properly considered by Governor Davis (15 Cal. Code Regs. §§ 2402(b), 2402(d)(3); *In re McClendon*, 113 Cal. App.4th 315, 322 (1st Dist. 2003)), the fact that petitioner has previously characterized the offense as an accident does not, by itself, show that he is unsuitable for parole.  *See In re Aguilar*, 168 Cal.App.4th 1479, 1491 (2nd Dist. 2008) (inmate need not admit guilt or "change his story" to be found suitable for parole).

/////

1   Governor Davis also emphasized the fact that petitioner claimed to have been

2   drinking on the day of the offense, stating that a blood alcohol test "administered immediately

3   after the murder" showed no presence of alcohol in petitioner's system.  It is unclear how the

4   governor concluded that a breathalyzer test was administered to petitioner immediately after the

5   murder.  To the contrary, petitioner indicated at his 2004 hearing that the cars wrecked at

6   approximately 6:00 p.m., and that he did not agree to take a breathalyzer test until after midnight,

7   having first refused a blood draw because he knew he had drugs in his system.  The probation

8   officer's report prepared for petitioner's sentencing indeed indicated that "a breathalyzer test

9   revealed no alcohol in [petitioner's] blood."  There is no indication that this test was

10  administered "immediately" after the offense, and it appears that the governor might have

11  jumped to such a conclusion.  In any event, petitioner has since clarified that he had not had

12  much to drink that day, but explained why he nevertheless believes alcohol to have played a role

13  in his offense:

14          But the reason why I [blame alcohol] is because if I drink any
            alcohol, if I drink a drink or two drinks of alcohol, I'm not a
15          normal person that can drink... I drink and then I want to go use
            drugs.  So therefore I am an alcoholic and I am a drug addict.  And
16          when those two things are combined it brings out all the other
            stuff...

17

18  (2004 Transcript at 27.)  The fact that petitioner claimed to have been drinking on the day of his

19  offense is not evidence that he is unsuitable for parole, despite the fact that a breathalyzer test

20  administered some time later detected no alcohol in his system.

21          Governor Davis's conclusion that petitioner lacked insight or remorse was

22  reached upon a documentary review of the evidence, in contrast to the contradictory conclusion

23  of the Board, which was reached after the opportunity to observe petitioner directly.  Although

24  the governor is not bound by the Board's findings, nothing in the record of this case contradicts

25  the Board's determination that petitioner *had* shown insight and remorse.  Governor Davis'

26  conclusion that petitioner lacked remorse was also contradicted by the findings of trained

18

1    professionals.  The most recent psychological evaluator, Dr. Macomber, wrote that it was "very

2    obvious" that petitioner was remorseful for his crime and that he "presently has a very good

3    understanding into the concrete, causative factors which led to his crime.  There is no evidence

4    that he was intellectualizing in his description of events."  (2003 Transcript at 38.)  Governor

5    Davis' unsupported scepticism of the psychological evaluator's conclusion in this regard does

6    not constitute reliable evidence that petitioner remains dangerous.  *See In re Roderick*, 154

7    Cal.App.4th 242, 272 (1st. Dist. 2007) (Board's arbitrary pronouncement that an inmate lacks

8    insight "cannot be considered some evidence to support a denial of parole" where unanimous

9    clinical evidence to the contrary is presented by trained experts).  There is no reliable evidence in

10   the record that petitioner remained unsuitable for parole at the time of the 2003 hearing because

11   he lacked insight or remorse into his previous criminality, including the commitment offense.

12                                    iv.  Social history

13               Finally, Governor Davis disagreed with the Board's determination that petitioner

14   had a stable social history.  Governor Davis appeared to base his finding that petitioner lacked a

15   stable social history upon petitioner's past drug abuse, his juvenile criminal record, and the fact

16   that he dropped out of high school in the ninth grade.  An "unstable social history" in the parole

17   suitability context, however, is defined as a "history of unstable or tumultuous relationships with

18   others."  15 Cal. Code Regs. §2402 (c)(3).  In contrast, a prisoner with a stable social history "has

19   experienced reasonably stable relationships with others."  15 Cal. Code Regs. §2402(d)(2)).

20   There is no indication in the regulation that drug abuse, a juvenile criminal record, or dropping

21   out of school are relevant to the consideration of a prisoner's social history.  *See* 15 Cal. Code

22   Regs. §§ 2402(c)(3), 2402(d)(2).

23               Petitioner's past drug abuse, juvenile criminal record, and failure to finish high

24   school do not show that he has a history of unstable or tumultuous relationships with others.

25   Governor Davis noted elsewhere in the decision, however, that petitioner had a tumultuous

26   relationship with the victim prior to her murder.  This is certainly an accurate factual finding with

                                              19

ample support in the record.  In petitioner's words, they had "a very wild and crazy relationship" in which "she would leave and come back and at times... I would leave.  And with the drugs and alcohol , it was out of control." (2003 Hearing at 11, 17.)  Petitioner further explained that they both abused methamphetamine and cocaine and that there was "a lot of promiscuity going on." (2003 Hearing at 17.)

The fact that petitioner had an extremely tumultuous relationship with the victim of his life crime does not constitute reliable evidence, by itself, that he was unsuitable for parole. Considered in conjunction with his commitment offense, criminal history and other pre-prison conduct, including prior car chases, stalking, and domestic violence, however, Governor Davis could reasonably conclude that there was some evidence at the time of the 2003 suitability determination that petitioner remained unsuitable for parole.  Thus, in spite of the fact that some of Governor Davis' findings are not supported by the record or are supported only in a limited sense, petitioner is not entitled to relief from Governor Davis' decision.  While there was certainly evidence in the record that would have supported a contrary conclusion, the governor's determination that the positive factors did not outweigh the gravity of petitioner's offense, criminal history, and other pre-prison conduct did not, on the facts of this case, violate his right to due process.

2.      2004 Board Decision and Subsequent Reversal by Governor Schwarzenegger

a.  The Board's 2004 grant of parole

The 2004 panel of the Board indicated its reliance upon the following circumstances in concluding that petitioner was suitable for parole and would not pose an unreasonable risk of danger to society or a threat to public safety if released from prison:

> The Panel did have an opportunity to review the prisoner's juvenile record.  It does not appear that there was any record of assaultive behavior as a juvenile.  However, there is a juvenile record that started somewhere around 4 October, 1974 and that includes possession of marijuana, disturbance of school activities.  There was a burglary, driving drunk, speeding, possession of a hypodermic needle.  And there was a resisting arrest but it doesn't

1     say it was assaultive.  A malicious mischief, another drunk driving
      and another resisting arrest.  Possession of a controlled substance.
2     And there was another resisting arrest.  And there was also a 242
      battery disposition and he was sent to a recover house when an
3     opening was available.  So it appears in retrospect, in looking at his
      juvenile record, there were some assaultive behaviors.  At least an
4     arrest for an assaultive behavior.  So we need to amend the record
      to indicate that prisoner was at least arrested for assaultive
5     behavior as a juvenile.  However, the Board did take that into
      consideration... We still found that he was suitable for parole.
6     However, there's every indication that while in prison the prisoner
      has enhanced his ability to function within the law upon release.
7     And we say that because he participated in educational programs.
      We note that he received a GED in 1990 and also there was a high
8     school diploma in 1993.  We also note that self-help programs, the
      prisoner has participated in an array of self-help programs, to
9     include... Impact of Crime, a victim's personal help, and self-
      energizing system.  Parenting, anger management, and also, which
10    is very important, there seemed to be an ongoing participation in
      substance abuse programs, NA or AA-type programs.  So certainly
11    we feel that has gone a long ways in the prisoner's demonstrating
      that he's ready for parole.  We also note that he did complete a
12    vocational program, silkscreening.  He completed that in 1999.  He
      also completed the apprenticeship that goes along with that, so
13    certainly we want to give him some accolades for that.  We also
      note that he's currently participating in the institutional work
14    program as a gardener and there are chronos, not job reports but
      there are chronos, from supervisors noting that he's doing a very
15    good job.  Because of maturation, growth, greater understanding
      and advanced age we feel that this [has] reduced the probability of
16    recidivism.  The prisoner is in his early 40s and hasn't received any
      disciplinaries for quite some time.  The last disciplinary that he
17    received was back on 2/16/91 for theft of state property and
      3/18/91 for failing to respond for count.  So that's been a
18    significant amount of time.  And we do feel that that's important in
      that we want to give him some accolades for his disciplinary-free
19    behavior.  Because he has demonstrated that he can program in a
      structured environment we thing that's important.  We also
20    reviewed his file and note that those were the only two
      disciplinaries, on 3/18/91 and 2/16/91.  We also note that there's a
21    128(c) in the file for altering a state hat and that was on 7/2/1992.
      We took all three of those disciplinaries into consideration and still
22    found that the prisoner is suitable.  So we did completely review all
      of his disciplinaries.  We do feel that the prisoner has a realistic
23    parole plan, which includes a job offer and a place to support (sic).
      He has family support.  He has maintained close family ties via
24    letters and I think that's quite evident today.  When we were
      reading through his letters we do note that his mother and father
25    have kept in contact with him.  His daughter have (sic) kept in
      contact with him.  And his daughter even cited in her letter that she
26    visited him and brought the grandbaby to visit him, so he have (sic)

maintained close family ties.  And it appears that he will be living
with his daughter so that's certainly in his favor.  As I previously
mentioned, he recently maintained positive institutional behavior,
which indicates a significant improvement in self-control.  We do
feel that the prisoner shows signs of remorse.  He indicated that he
understands the nature and magnitude of the offense and accepts
responsibility for his criminal behavior and has a desire to change
towards good citizenship.  And we think, as articulated in his
counselor's report and both the psychological report, both of those
reports tend to indicate or lend support that the prisoner have (sic)
a desire to change towards good citizenship.  We note that the
correctional counselor writes in his most recent report, he feels
that-- He says, considering the offense, commitment offense, prior
record, psychological report, the BPT decision and prior
adjustment this writer believes that Banks would probably pose a
low degree of threat to the public at this time if released from
prison.  Banks have (sic) accepted full responsibility for his crime.
And he also notes that hte prisoner has been clean and sober since
the end of July 1989 and he has plans to continue with NA and AA
when paroled from prison.  He also notes that the prisoner has
maintained positive contact with the victim's son, aunt,
grandmother and father.  The prisoner has established home
ownership along with a portfolio of investments and savings
accounts to financially assist him when released back into society.
So certainly it's a very good report from the correctional counselor.
The recent psychological report shows that the prisoner is making
progress.  The most recent psychological report was completed for
the February 2000 Board report.  And that report was completed by
Dr. Melvin Macomber.  Dr. Macomber reports, assessment to
dangerousness within the controlled setting of the institution is
definitely below average in comparison to other inmates.
Assessment of dangerousness if released to the community at this
point in time is definitely below average in comparison with other
inmates.  In fact, his potential for violence in the community, if not
lower, due to his growth experiences in prison and knowledge of
the effects of aggressive behavior.  In this case the only risk factors
were drugs and alcohol, however, the potential of this man
reverting to drug or alcohol abuse is essentially nil.  So the doctor's
really putting himself out on the limb there.  It's a very good
report.  We feel that the prisoner is -- have (sic) made progress in
that area.  And we go back to that desire for good citizenship so it's
certainly documented.  Macomber feels that the prisoner have (sic)
a desire for good citizenship and certainly that played a role in the
Board's suitability finding.  Another letter from Dr. Macomber--
Not another letter but a psychological report, 7/3/01.  It's a very
short report but in his assessment he said, Mr. Banks continued to
make a good adjustment.  His attitude is very good.  There is no
evidence of psychopathology that will require therapeutic
intervention.  There is no evidence of psychological problems that
would preclude his release to parole supervision.  Violence
potential continues to be low.  So certainly that's in his favor.  The

next report, full evaluation that I tool a look at, goes all the way back to 1999.  In that report Dr. Savage..., clinical psychologist, it's dated 10/26.  He writes, Inmate Banks appears to present a lower than average dangerousness within a controlled setting.  If released to the community his risk of out of control or unpredictable behavior would be in direct proportion to his using drugs or alcohol.  He is devoutly committed to his 12 step program and does not appear at risk for a relapse.  This one crime is his only violent crime and does appear to have been an accident.  He appears to be a low risk of re-offending.  So we took a look at the last three psychological evaluations by two different clinicians and they all seem to come to the same conclusion.  That this prisoner have (sic) a desire to be a good citizen and he addressed the issues of the causative factors that caused him to commit the crime that he committed.  So those are some of the reasons that we again found the prisoner suitable...

(2004 Transcript at 86-92.)

             b.  Governor Schwarzenegger's 2003 reversal

This time, the Board's decision that petitioner was suitable to be released on parole was reversed by Governor Schwarzenegger.  Governor Schwarzenegger recounted the circumstances of petitioner's commitment offense and "rocky" pre-prison lifestyle, but also considered several factors that were supportive of petitioner's parole.  He concluded that

The gravity of the second degree murder for which Mr. Banks was convicted is alone a sufficient basis on which to conclude that his release from prison at this time would pose an unreasonable public safety risk.

After serving 14 years of his 16-to life prison sentence, Mr. Banks has made some creditable gains.  But after carefully considering the same factors that the Board of Prison Terms must consider, I find the gravity of the murder committed by Mr. Banks presently outweighs all factors tending to support his parole and necessitates a longer period of incarceration.  Accordingly, because I believe Mr. Banks would pose an unreasonable risk of danger to society if released from prison at this time, I REVERSE the Board's 2004 decision to grant parole to Mr. Banks.

(Schwarzenegger Letter at 3.)  Governor Schwarzenegger placed particular emphasis on the fact that the commitment offense was "the culmination of months of torment" of the victim by petitioner, and the fact that it was not the first time that petitioner had used his vehicle in a

23

potentially deadly manner.  In concluding that the gravity of petitioner's offense outweighed all

positive factors for parole, Governor Schwarzenegger, like Governor Davis, considered and

relied on petitioner's other pre-prison conduct in addition to the offense itself. He wrote:

> [T]he murder of Ms. Rees was especially atrocious because it was not the first time Mr. Banks had used his vehicle in a deadly manner, particularly when angry or frustrated.  In addition to his one-year earlier conviction for driving while impaired, in October 1986, Mr. Banks drove his truck in front of the car of his ex-girlfriend Tanya, blocking her path and threatening to kidnap her. On another occasion, he waited all night outside of a house until he saw Tanya and her new boyfriend leave in separate cars-- and then chased them in his truck and attempted to run Tanya's boyfriend off the road.
>
> Nor was the night of the deadly chase the first time Mr. Banks had tormented Ms. Rees.  He admitted at his 2004 hearing that in October 1988, just months before the murder, he kidnapped Ms. Rees, tied her to a bed, and hit her with the butt of a rifle.  When asked by the Board why he had done this, Mr. Banks replied, "I was very angry, hurt, insecure and under the influence of drugs and alcohol."  According to the probation report, in November 1988, police were called when Mr. Banks was seen dragging Ms. Rees from the school where she had gone to pick up her son.  Ms. Rees told the police that Mr. Banks had threatened to beat her, had made threats to kill her, and that she had purchased a gun because she was afraid of him.  Mr. Banks acknowledged that this incident had occurred and told the 2004 Board, "Again, I was angry at the time, frustrated."
>
> He further admitted to the 2004 Board that he stalked Ms. Rees during the week before her murder and just days before the murder had threatened to kill her.  Based on the record before me, there is evidence that the murder of Ms. Rees was the culmination of months of torment by Mr. Banks.

(Schwarzenegger letter at 2.)

Governor Schwarzenegger's reliance on petitioner's commitment offense and its

timing in light of the specific nature of his criminal history and other pre-prison conduct was not

without support in the record.  Simply put, at the time of the 2004 hearing, not enough time had

passed to allow a reviewing court such as this one to say that reliance on such unchanging factors

was arbitrary or that such factors no longer held *any* probative value. Although there were many

positive factors for petitioner's release, this court is not authorized to weigh those factors against

24

1   the others relevant to a parole suitability determination.  It is enough that there was some

2   evidence to support the governor's determination that the circumstances of petitioner's

3   commitment offense, criminal history, and other pre-prison conduct required a more lengthy

4   period of incarceration.

5   B.      Eighth Amendment

6           Petitioner additionally contends that the denial of parole has implicated his Eighth

7   Amendment right to be free from cruel and unusual punishment.  As previously set forth,

8   respondent denies that petitioner exhausted his Eighth Amendment claim with respect to

9   Governor Davis's 2003 reversal.  Nevertheless, this claim can still be decided on the merits.  *See*

10  *Gutierrez v. Griggs*, 695 F.2d 1195, 1198 (9th Cir. 1983) ("a district court may dismiss a habeas

11  petition without resolving whether a petitioner has exhausted available state remedies when on

12  the face of the petition it is obvious that the petition lacks merit").

13          A criminal sentence that is not proportionate to the crime of conviction may

14  indeed violate the Eighth Amendment.  Outside of the capital punishment context, however, the

15  Eighth Amendment "forbids only extreme sentences that are grossly disproportionate to the

16  crime." *United States v. Bland*, 961 F.2d 123, 129 (9th Cir. 1992) (*quoting Harmelin v.*

17  *Michigan*, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring).  The gross disproportionality

18  rule set forth by the Supreme Court in *Harmelin* is the only clearly established law applicable to

19  petitioner's Eighth Amendment challenge.  *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003).

20          The threshold for an inference of gross disproportionality is high.  Generally, so

21  long as the sentence imposed by the state court does not exceed statutory maximums, it will not

22  be considered cruel and unusual punishment under the Eighth Amendment. *United States v.*

23  *Mejia-Mesa*, 153 F.3d 925, 930 (9th Cir. 1998) ("punishment within legislatively mandated

24  guidelines is presumptively valid"); *United States v. McDougherty*, 902 F.2d 569, 576 (9th Cir.

25  1990).

26  /////

1    In *Harmelin v. Michigan*, the Supreme Court held that a term of life in prison

2 without the possibility of parole is not disproportionate to the crime of possession of 672 grams

3 of cocaine. 501 U.S. 957, 1009 (1991). As the Ninth Circuit observed, "[u]nder *Harmelin*, it is

4 clear that a mandatory life sentence for murder does not constitute cruel and unusual

5 punishment." *United States v. LaFleur*, 971 F.2d 200, 211 (9th Cir. 1991). Of course, in this

6 case, petitioner did not receive a mandatory life sentence, but rather, a life sentence which carries

7 the possibility of parole. To the extent petitioner contends his sentence was effectively

8 transformed into one *without* the possibility of parole, the argument must be rejected. So long as

9 each parole decision by the Board or, in this case, the governor, is supported by some evidence in

10 the record it cannot be said that the sentence was converted to one of life without the possibility

11 of parole. The state court decisions upholding the respective reversals of Governor Davis and

12 Governor Schwarzenegger are not contrary to, or an unreasonable application of the gross

13 disproportionality principle. Accordingly, there can be no relief for petitioner's Eighth

14 Amendment challenges to the denial of parole.

15 C.    State Law Violations

16    Despite references to the Due Process Clause, it appears that petitioner's grounds

17 two and three allege only violations of state law.

18    The state courts' interpretation and analysis of the proper application of section

19 3041 of the California Penal Code and its implementing regulations may not be challenged in this

20 federal habeas corpus action. *See, e.g.*, *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (state court's

21 interpretation of state law binds a court sitting in habeas corpus); *Estelle v. McGuire*, 502 U.S.

22 62, 67-68 (1991) ("It is not the province of a federal habeas court to reexamine state-court

23 determinations on state-law questions"); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir.

24 1985).

25    For the same reason, petitioner's alleged violation of the separation of powers

26 doctrine of the California Constitution does not give rise to a claim for federal habeas corpus

26

relief.  To the extent petitioner contends that the governors' exercise of discretion violated the *federal* doctrine of separation of powers, the claim is not cognizable because the federal doctrine of separation of powers does not extend to the states under the Fourteenth Amendment.  *See Hughes v. Superior Court*, 339 U.S. 460, 467 (1950) ("the Fourteenth Amendment leaves the States free to distribute the powers of government as they will between their legislative and judicial branches").  There can be no relief for petitioner's claims that the denial of parole violated state law.

## VII.  CONCLUSION

For the foregoing reasons, IT IS HEREBY RECOMMENDED that Petitioner's application for writ of habeas corpus be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED: May 6, 2010

*Charlene H. Sorrentino*
CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE